POKORNY, Appellant, v. STASTNY, Respondent.

*No. 65.   Argued March 29, 1971.—Decided May 4, 1971.*
(Also reported in 186 N. W. 2d 284.)

18

For the appellant there was a brief by *Braden & English* of Lake Geneva, and oral argument by *James L. English*.

For the respondent there was a brief by *Kenney, Korf & Pfeil* of Elkhorn, and oral argument by *Richard H. Pfeil.*

WILKIE, J. The only real issue presented is whether the trial court erred in nonsuiting the plaintiff. More specifically, the question is whether the determination of the intent of the language of the release presented a jury question as to defendant's alleged liability for plaintiff's claims for a $5,000 service fee and for $2,900 business losses. It did.

The trial court perceived the issue to be whether the release was a complete integration of all the previous negotiations and agreements between the parties. In such a case the intent of the parties is the critical inquiry. The trial court specifically considered *Danielson v. Bank of Scandinavia,*[1] in which case the court noted that in determining the intent of the parties in this respect the search is not limited to the writing itself but is extended to "the subject matter and surrounding circumstances."[2]

Although the trial court here received evidence of the circumstances leading up to and surrounding the execution of the release, the trial court nonsuited the plaintiff and concluded that a jury issue was not presented on

[1] (1930), 201 Wis. 392, 230 N. W. 83.
[2] *Id.* at page 398.

this question of intent, at least as far as the evidence had been concluded through plaintiff's case. The trial court reasoned:

". . . Where the facts are undisputed as far as the words and the terms of the contract, or the release itself, then the court must make the determination as a matter of law as to whether or not the claim, or claims in this case, are incorporated or integrated within the prime meaning of the release. So it seems to me that the feelings of the Pokornys, and their understanding of the agreement, or alleged agreement, of the defendant with regard to these two items only becomes a jury issue in the event that the court as a matter of law decides or concludes that either this release is ambiguous in its terms, or that it is susceptible to various interpretations in its entire meaning, and then, and in that event only, would the matter be a jury issue. . . . As I read this release, plaintiff's exhibit one, and I have read it many times, I always come back to the conclusion that if the words are clear in their meaning, the subject matter that we are talking about falls squarely in the provision of the lease, 'rental, operation, maintenance and use of the Colonial Kitchen.' It seems to me that if the court concludes, and I am forced to conclude, and I do conclude, that these two claims fall squarely within the terms of the release, and specifically in the quoted portion that I just read, then there is no possible jury issue."

The May 9th release is unclear and ambiguous. That release is couched in terms of a general release yet it speaks only of satisfying all claims in tort and equity. The presently asserted claims are based on contract; the release makes no mention of them. Although the release states that it includes any matters relating to the "rental, operation, maintenance and use of the 'Colonial Kitchen' " this description is ambiguous in terms of these two claims and does not point as a matter of law to the trial court's conclusion that the claims come squarely within the terms of the release.

In *Danielson,* the court cites Wigmore to the following effect:

". . . Difficulty arises when an attempt is made to determine what constitutes the part of the transaction which was in fact reduced to writing. Dean Wigmore has laid down three tests: (1st) whether a particular subject of negotiation is embodied in the writing depends wholly upon the intent of the parties thereto; (2d) this intent must be sought in the conduct and language of the parties and in the surrounding circumstances; (3d) in deciding upon this intent, *the chief and most satisfactory index for the judge is found in the circumstance whether or not* the particular element of the alleged extrinsic negotiation is dealt with at all in the writing. If it is mentioned, covered, or dealt with in the writing, then presumably the writing was meant to represent all of the transaction on that element; if it is not, then probably the writing was not intended to embody that element of the negotiation. 5 Wigmore, *Evidence* (2d ed.), sec. 2430." (Emphasis supplied.) [3]

Here, in addition to the fact that the release makes no mention of the two claims now asserted by the plaintiff, the parol evidence presented indicates (1) that plaintiff's attorney never specifically mentioned the business-loss claim when negotiating this settlement and in fact was not even aware of the service fee claim; (2) the letter of April 22, 1966, from plaintiff's attorney to defendant's attorney, which immediately preceded the drafting of the release by defendant's attorney, makes no mention of these claims, but *does specifically mention* that plaintiff is giving up *his claims for meals and bartending wages*. The only reference in any of the correspondence to either of the claims here asserted by plaintiff is in the letter from plaintiff's attorney to defendant's attorney, dated October 27, 1965, eighteen months before the release was executed, in which letter plaintiff's attorney attempts to sort out the situation as it exists. Plaintiff's attorney merely states that plaintiff had

[3] *Id.* at pages 398, 399.

told him defendant had promised to pay him for the business losses.

This parol evidence clearly raises the question of intent and the jury should have been afforded an opportunity to consider the question.

*Plummer v. Leonhard* [4] is a recent case which involved two employment contracts, each of which purported to integrate all other agreements, and serve as a release of all prior claims. Plaintiff sought, however, to recover $4,320 he paid to an insurance agency. At the time the money was so paid, defendant was the sole proprietor of the agency and plaintiff was his employee. Plaintiff alleged the money was a loan; defendant alleged it was the return of an overdraw and in addition, pleaded the two employment contracts as a defense, contending they were releases of any prior claims, including the one sued on. The trial court sent the question to the jury which found for the plaintiff.

On appeal, the defendant argued that it was error for the trial court to submit the question to the jury since the language of the "release" was "clear and unambiguous." This court reviewed the language of the agreements, most notably the following:

" '1. All former contracts and agreements both written and oral are abrogated and the parties hereto mutually release each other from any claim arising out of any previous contracts and this contract shall supersede and release any and all previous contracts.' " [5]

(Admittedly, this language is as "clear and unambiguous" as that involved in the present case.)

This court then stated:

". . . 'As otherwise stated the rule is that, if an intent to limit the scope of the release appears, it will be

---

[4] (1969), 44 Wis. 2d 686, 172 N. W. 2d 1.

[5] *Id.* at pages 689, 690.

restricted to conform to such intent. The foregoing general rule has been said to be merely a rule of construction and not a strict rule of law, and to be inefficacious to control a court as against the obvious intention of the parties.' 76 C. J. S., *Release,* p. 671, sec. 38. While great liberality is allowed in construing releases, the operation will be limited to those things within the contemplation of the parties at the time of execution of the release. *See Rensink v. Wallenfang* (1959), 8 Wis. 2d 206, 213, 99 N. W. 2d 196. The determination of intent of the parties to a release, and the scope of a release, is a question of fact for the jury.

" 'The scope of a release, and the intention of the parties that the release shall cover particular claims, are for the jury or other triers of the facts; but where the facts are undisputed, the scope has been held to be for the court.' 76 C. J. S., *Release,* p. 721, sec. 72.

"Therefore, the issue is whether the trial court should have taken the question from the jury and ruled as a matter of law that the 1965 and 1966 agreements extinguished plaintiff's claim. We conclude the trial court properly decided the question should be determined by the jury." [6]

In addition, the consideration given for the release is an element that is properly considered.[7] In this case, plaintiff expressly asserted (at least) claims totaling approximately $2,000 (bartending wages, $850; unpaid for meals, $500; kitchen fixture, $275; rent adjustment, $100; lamps, $350.32). Defendant paid a total of $725.32, the amount allegedly due on three of these five claims (*i.e.,* kitchen fixture, rent adjustment, and lamps). The

[6] *Id.* at page 692.

[7] *Doyle v. Teasdale* (1953), 263 Wis. 328, 57 N. W. 2d 381; *Jandrt v. Milwaukee Auto Ins. Co.* (1949), 255 Wis. 618, 39 N. W. 2d 698. While these cases dealt with mistake, and the opinion indicates inadequate consideration is strong evidence of mistake or fraud, there appears no good reason why the consideration given, while not controlling, should not be considered when attempting to determine the intent of the parties as to the scope of the release.

correspondence *expressly* states plaintiff was giving up the bartending wages and unpaid meals ($1,350). The consideration, then, covers the precise amount allegedly due on three claims *expressly* mentioned, and plaintiff *expressly* gives up two claims. The consideration does not contain any allowance for the $11,000 in claims originally asserted by plaintiff in the instant action (the business losses were subsequently stipulated at $2,900).

Given these circumstances, and viewing them in the light of plaintiff's attorney's testimony that he was never authorized to collect the specific claim for business losses (he was not even aware of the service fee claim) and his further inability to remember either the details of the negotiations (but he was aware these claims were never expressly mentioned therein) or the details of his conference with plaintiff and plaintiff's wife at the time the release was executed, it would not have been unreasonable for the trial court to have concluded that the release was not intended to cover these claims.

Therefore, we conclude that the trial court erroneously nonsuited the plaintiff. The trial court must be reversed and the defendant, who has not yet been heard from, allowed to present his case.

In reaching this conclusion we have considered the additional issue raised by defendant-respondent that the plaintiff's attorney had apparent authority to compromise the instant claim when negotiating the release here involved. We find this argument has no merit because (1) the release was executed by the plaintiff, not his attorney, and therefore plaintiff's intent, not his attorney's, is controlling; (2) there is no evidence that plaintiff's attorney even orally compromised the instant claims during any of the negotiations preceding the execution of the release; (3) there is no evidence of apparent authority to compromise such claims bottomed on some act of the principal (the plaintiff). In this

case the plaintiff's testimony is that he merely mentioned the business-loss claim to his attorney, and his attorney testified he was never specifically authorized to collect it, and he was not aware of the business-loss claim. (4) There is no evidence of justifiable reliance by defendant to his detriment.

Even assuming defendant had established a compromise in fact, and apparent authority as a matter of law, it would be of no avail, since the defendant must establish that plaintiff's attorney had *express* authority to compromise his client's claim.[8] There is no evidence of express authority here.

*By the Court.*—Judgment reversed and cause remanded for further proceedings not inconsistent with this opinion.

[8] *Fosha v. O'Donnell* (1904), 120 Wis. 336, 97 N. W. 924.